## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FABIO FRAZZETTO,

      Defendant.

No. 1:11-cr-866-JSR

### DEFENDANT FABIO FRAZZETO'S
### SENTENCING MEMORANDUM

Defendant Fabio Frazzetto files this memorandum to assist the Court in determining an appropriate sentence. He respectfully submits that a sentence of time served—comprising the time he spent in custody on the day of his voluntary surrender—is sufficient to comply with 18 U.S.C. § 3553(a) and is warranted by his cooperation; his acceptance of responsibility, including his voluntary surrender to federal authorities on U.S. soil when he could not have been extradited; his otherwise exemplary life and character; and the need to avoid unwarranted disparities with the sentences of convicted Swiss bankers who engaged in more egregious conduct and had significantly higher Guideline ranges. In these circumstances, a sentence of time served is "sufficient, but not greater than necessary," to accomplish the purposes of federal sentencing in light of the U.S. Sentencing Guidelines and the other § 3553(a) factors. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).

**BACKGROUND**

I.     **Mr. Frazzetto's Personal Background and Employment History**

A.     **Mr. Frazzetto's Personal Background**

Mr. Frazzetto was born in 1973 in Zurich, Switzerland.  His parents were blue-collar immigrants who came from Sicily to Switzerland for work.  Between the ages of four and eleven, Mr. Frazzetto was raised in Sicily by his grandparents, while his parents worked in Switzerland and planned to return to Sicily when they could afford to do so.  A continued scarcity of jobs, however, compelled his parents to settle in Switzerland, and Mr. Frazzetto returned to them in 1984.  His parents worked hard as unskilled laborers to provide for the family's basic needs.  Mr. Frazzetto's father, Gaetano (now 73), eventually became a milling cutter, before being forced to retire by injuries from a car accident.  Mr. Frazzetto's mother, Agata (now 69 and also retired) worked mainly as a seamstress.  Both parents worked nights as well as days to provide for their family.

Mr. Frazzetto's family is his top priority.  He and his wife, Evelina Li Puma-Frazzetto, have been together for more than twenty-five years.  Ms. Frazzetto has remained totally supportive throughout this ordeal.  The two have a strong, loving relationship built on trust, respect, and honesty.  Their two children, Giulia (9 years old) and Elena (7 years old), are the center of their universe and have never been separated from both parents for even a single night.  Mr. Frazzetto is the principal breadwinner; his wife works part-time at a health insurance company.

Mr. Frazzetto also has two sisters.  His younger sister, Sabina, is intellectually disabled,[1] and she cannot perform many of the tasks of daily life—especially those requiring logical and mathematical ability—without assistance.  Mr. Frazzetto helps her with these tasks—for example, with paying her bills; dealing with her employer (she works in a protected workplace), her landlord, and the authorities; as well as other matters affecting her health and finances.  Mr. Frazzetto does this because he loves his sister, and because his support enables her to live relatively independently.  Moreover, it is a great relief to his parents, who, because of their age and their limited German skills, are not as capable of providing this support as Mr. Frazzetto.

## B.   Mr. Frazzetto's Employment History

After completing the Swiss equivalent of high school and an apprenticeship, Mr. Frazzetto spent approximately thirteen years at three banks (Zuercher Kantonalbank; Mitsubishi Trust and Banking Corporation; and Citigroup) working in various areas—mainly commercial, investment, and retail banking, and asset management.  He was not a private banker, had no U.S. clients, and never traveled to the United States.

In mid-2005, however, at the age of thirty-one, Mr. Frazzetto's career changed dramatically.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████

---

[1]  Sabina Frazzetto suffered oxygen deprivation at birth that permanently damaged her brain and the muscles and nerves of the right side of her body.  The PSR inaccurately states that she also suffers from depression.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

It was then that Mr. Frazzetto became the person responsible for managing accounts beneficially owned by U.S. persons.   He started this position with no prior clients.   In fact, throughout his time on the North American Team, Mr. Frazzetto inherited approximately 95% of his clients from other relationship managers.   Thus, rather than developing new clients of his own, Mr. Frazzetto primarily serviced accounts that were transferred to him.[2]   Unfortunately, many of these inherited clients were U.S residents who had not provided the Bank with an IRS Form W-9, and who, based on that and other circumstances, Mr. Frazzetto came to understand were not declaring their assets and income to the IRS.   ████████████

████████████████████████████████████████████

███████████████████████████████████████

In the fall of 2008, the Bank assigned Mr. Frazzetto an additional role.   As part of its efforts to remediate its U.S. business, Julius Baer began centralizing its U.S.-based clients in

---

[2]  As one supervisor on the North American Team (by then renamed the International Clients Team) put it, Mr. Frazzetto was "not a hunter but . . . an effective farmer / account manager, who follow[ed] the Bank's rules and procedures diligently."   *See* June 28, 2010 email, a redacted copy of which is attached as **Exhibit A**.

the North American Team, preparatory to closing their accounts if they failed to provide evidence of tax compliance.  The Bank assigned Mr. Frazzetto and co-defendant Daniela Casadei to receive these reassigned U.S. clients, with the result that they briefly became nominal relationship managers for a significant number of other relationship managers' accounts.  As part of the Bank's remediation efforts, Mr. Frazzetto also, in the second half of 2009, began telling his U.S. clients to declare their accounts to the IRS or close them.

As the Bank wound up its U.S. business, Mr. Frazzetto applied to transfer to another desk that managed accounts for Swiss nationals.  But he was unsuccessful.  In September 2011, Mr. Frazzetto left Julius Baer for a position at UBS managing employee—not external client—accounts.[3]  When the indictment was filed two months later, UBS terminated his employment.

For the next fifteen months, Mr. Frazzetto was unemployed.  He persistently tried to find another job, but potential employers showed no interest in hiring an indicted banker.[4]  For a time, Mr. Frazzetto even worked for a valet-parking service, where he helped manage the books and park cars at the airport.  He struggled to support his wife and daughters.

Finally, in February 2013, Mr. Frazzetto rejoined Julius Baer as a member of its mutual fund selection team, where he has been ever since.  Mr. Frazzetto now analyzes, recommends, and monitors mutual funds, with a particular focus on sustainable and socially responsible investments.  Mr. Frazzetto is especially proud of this work, and he has become a

---

[3]  The statement in the PSR that Mr. Frazzetto has been employed at the Bank since 2005 is not correct.

[4]  With a view to entering a new field of work, Mr. Frazzetto began a training program at the Lucerne University of Applied Sciences and Arts to become a Swiss Certified Treasurer.  He completed the program and received the certificate in 2013.

recognized expert on his team.  Since joining the Bank's mutual fund selection team, Mr. Frazzetto has also continued to improve himself, including by earning a Certificate of Advanced Studies in Real Estate Finance in 2017.

Unlike some of the other Swiss financial professionals who have pleaded guilty, Mr. Frazzetto has never been wealthy.  And though he is glad to have a job and grateful to his employer, Mr. Frazzetto earns about the same today as he did seven years ago.  Because he managed undeclared accounts for U.S. tax evaders for several years in his thirties, he will not be able to provide for his family's future in the manner he had hoped.

## II.    The Offense

Mr. Frazzetto violated 18 U.S.C. § 371 by helping some U.S. clients avoid their tax obligations.  For generations, clients have been attracted to Swiss banks because of the confidentiality mandated by Swiss law.  Many Americans used those laws to evade their taxes.  From early 2006 through August 2009, Mr. Frazzetto serviced Julius Baer accounts for U.S. clients, knowing or having reason to know that the majority of these clients were using their accounts to evade taxes.  While convinced that he was acting in accordance with Swiss law and then-existing Bank policy, Mr. Frazzetto assisted these clients in evading taxes by managing their accounts.  Some of the accounts were held in the names of non-U.S. entities or individuals as a way of concealing the clients' beneficial ownership of the accounts.  Mr. Frazzetto knew, however, that these accounts were beneficially owned by U.S. citizens and residents.  Like many other Swiss bankers, Mr. Frazzetto also traveled to the United States to meet with his clients.  These actions facilitated certain clients' tax evasion. Mr. Frazzetto deeply regrets violating U.S. law.

### III.     Mr. Frazzetto's Voluntary Surrender

After Mr. Frazzetto learned he was indicted in October 2011, he retained counsel to advise him on U.S. law and negotiate a resolution.  Although safely residing in Switzerland with no threat of extradition, he wanted to resolve his case.  After a proffer in Vienna, Austria, in June 2015, Mr. Frazzetto agreed to travel to the United States to surrender.

Thus, on January 31, 2016, Mr. Frazzetto boarded a flight to Kennedy Airport, with a brief stop scheduled in Toronto.  But his decision to surrender was nearly thwarted. Although he was traveling with a Significant Public Benefit Parole Visa, Canada Border Services Agency ("CBSA") officials detained Mr. Frazzetto and refused to allow him to enter Canada for the layover.  Indeed, the Canadian officials encouraged him to return to Switzerland.

Mr. Frazzetto rejected this proposal, and instead attempted to convince the CBSA to allow him to remain in Canada for a few days to resolve the situation.  After several days, with the assistance of the prosecutors and others, Mr. Frazzetto was permitted to depart for New York.

Upon his arrival at Kennedy airport on the morning of February 2, 2016, Mr. Frazzetto was taken into custody by special agents of the IRS.  He was then "processed" and held by U.S. Marshals Service deputies until his release upon conditions later that afternoon. Two days later, on February 4, Mr. Frazzetto appeared before U.S. District Judge Swain and entered a plea of guilty to a superseding Information, accepting full responsibility.  His conditions of release were continued pending sentencing, and he has fully complied with them.

IV.     **Mr. Frazzetto's Cooperation**



## ARGUMENT

### I.     The Advisory Guidelines Support a Sentence of Time Served.

The defense agrees that the Presentence Investigation Report ("PSR") correctly calculates the advisory guideline range under the current[7] U.S. Sentencing Guidelines (the "Guidelines") at 30–37 months.  However, the facts set forth above, those which the defense anticipates will be described in the government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1, and those presented in the PSR, show that the advisory guideline range is not reasonable as applied to Mr. Frazzetto.  Rather, Mr. Frazzetto's cooperation warrants a downward departure to a sentence of time served.



---

[7]  The United States Sentencing Commission has proposed an amendment to the Guidelines that would add a new Chapter 4 Guideline, at § 4C1.1, providing lower guideline ranges for "first offenders" (the "Proposed First Offender Guideline").  *See* U.S. Sentencing Commission, Sentencing Guidelines for United States Courts, 82 Fed. Reg. 40651, 40652, 40656–59 (Aug. 25, 2017).  If adopted, the Proposed First Offender Guideline would reduce by one the offense level of first offenders with no criminal history whose offense level is otherwise 16 or greater.  Under the Proposed First Offender Guideline, Mr. Frazzetto's total offense level would be 18, with a corresponding advisory guideline range of 27–33 months.

[8]









## II.   The Other Section 3553(a) Factors Also Support a Sentence of Time Served.

### A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Support a Sentence of Time-Served.

Mr. Frazzetto fully accepts responsibility for his conduct.  He acknowledges that he assisted clients in defrauding the U.S. government in violation of 18 U.S.C. § 371.  He recognizes that this is serious offense, and he deeply regrets his actions.  But several mitigating factors should be considered in evaluating his offense.

---



First, when Mr. Frazzetto became a relationship manager, managing undeclared accounts was standard practice in Switzerland.  This is demonstrated by the Swiss financial sector's broad participation in the Tax Division's 2013 Program for Non-Prosecution Agreement or Non-Target Letters for Swiss Banks (the "Swiss Bank Program"), which permitted Swiss banks that committed tax offenses in connection with undeclared U.S. accounts to resolve their potential criminal liability—in the vast majority of cases—by paying a fine.[15]   DOJ collected more than $1.36 billion from the 80 Swiss banks in "Category 2" of the Program.[16]  Other Swiss banks, in "Category 1," have paid more than $4 billion in penalties.  Thus, Mr. Frazzetto's conduct was not an isolated practice; it was engrained in an entire industry.

Second, Mr. Frazzetto's conduct in servicing undeclared accounts occurred ████ ████████████████████████████████ and in accordance with the Bank's then-existing policies.  While this certainly does not excuse Mr. Frazzetto's actions, managing undeclared accounts—and for that purpose, traveling to the U.S. to meet with clients—was considered part of his regular job responsibilities.  Indeed, although Mr. Frazzetto's superiors will likely never be charged, the Bank itself has accepted responsibility, entered into a DPA, and paid a substantial penalty.

Third, the nature and extent of Mr. Frazzetto's involvement distinguish him from other Swiss bankers involved in managing undeclared accounts.  For most of his career, Mr.

---

[15]   *See* U.S. Dep't of Justice, Tax Division, Swiss Bank Program, https://www.justice.gov/tax/swiss-bank-program (last updated Feb. 6, 2017).

[16]   *See* U.S. Dep't of Justice, Office of Public Affairs, Justice Department Reaches Final Resolutions Under Swiss Bank Program (Dec. 29, 2016), https://www.justice.gov/opa/pr/justice-department-reaches-final-resolutions-under-swiss-bank-program.

Frazzetto was not a private banker at all, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████.  Then 32 years old, Mr. Frazzetto became the North America

Team's youngest relationship manager, and before then he had no clients at all.  Moreover,

Mr. Frazzetto managed undeclared accounts—other than as part of the Bank's exit program,

and by helping clients make voluntary disclosures to the IRS—for less than four years, and

he never had any management responsibility or influence on Bank policies or procedures..

Fourth, the offense level determined under U.S.S.G. §§ 2T1.1 and 2T4.1 overstates

Mr. Frazzetto's culpability.  As this Court has frequently noted, loss-driven guidelines fail to

adequately reflect other factors affecting individual culpability, and, therefore, frequently

result in irrational sentences.[17]  The irrationality of using loss as the primary measure of

culpability is aggravated here, where the offense level is driven by an atypical kind of loss—

the taxes Mr. Frazzetto's taxpayer-clients failed to report, rather than taxes he himself

evaded.[18]  Moreover, the loss has been estimated using an arguably questionable

---

[17]  *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *United States v. Adelson*, 441 F. Supp. 2d 506, 512-13 (S.D.N.Y. 2006), *aff'd mem.*, 301 F. App'x 93 (2d Cir. 2008); Transcript of Sentencing Hearing at 2–3, *United States v. Lumiere*, No. 1:16-cr-483 (S.D.N.Y. June 27, 2017), ECF No. 115); Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes, American Bar Association at 6–7 (Nov. 10, 2014).  Embracing such criticisms, the Second Circuit has encouraged sentencing courts to consider a non-Guidelines sentence where—as with the U.S.S.G. § 2T1.1—the Sentencing Commission has assigned a relatively low base offense level to a crime and then increased it significantly by a loss enhancement. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  The court should do so here.

[18]  *See* Excerpt of Sentencing Hearing at 8, *United States v. Bergantino* (E.D. Va. Mar. 17, 2017), ECF No. 116 (Gerald Bruce Lee, J.) (opining in another Swiss banker sentencing hearing that the tax guidelines, which were "driven typically in a situation where someone is a tax cheater, and it looks at the amount of the tax liability," produced a guidelines range that

methodology.   As the defense understands, the PSR estimated the tax loss using a per-account, per-year tax loss figure that was borrowed from *United States v. UBS AG*, No. 09-cr-60033 (S.D. Fla.).   If so, the tax loss was estimated using information about investment accounts that (1) were held at a different bank; (2) likely had different portfolio types and asset allocations; and (3) were held when aggregate market returns were significantly higher than during the period at issue here.   Accordingly, the PSR's tax loss estimate appears questionable, and the resulting guideline range equally so.   In similar circumstances, this Court has placed little or no weight on the advisory guideline range.   *See* Transcript of Sentencing Hearing at 15–16, *United States v. Allen*, No. 14-cr-272-5 (S.D.N.Y. Mar. 22, 2016), ECF No. 242 (observing that the Guidelines yielded an "absurd" result where "50 percent of the guideline calculation is based on what is, at best, a questionable approach to calculation, though not an unreasonable one . . . .").   It should do the same here.

Fifth, and most importantly, apart from this case, Mr. Frazzetto's record is exemplary. Before he was indicted, he had never been accused of violating the laws of any country, and his voluntary surrender when he could not have been extradited, his acceptance of responsibility, and his extraordinary cooperation demonstrate his remorse and respect for the law.   Those who know him well have written letters to the Court describing his character and integrity.   As these letters attest, Mr. Frazzetto is no typical Swiss banker.   He is, above all, a loving father, husband, brother, and son, on whom his family can always depend.   He teaches his daughters about life, respect, and manners, and helps his disabled younger sister live as

---

(37 to 46 months) that "I think will be grossly excessive in this case given the nature of the offense, and the focus should [instead be] on the taxpayers").

independently as possible.[19]  His usual activities outside work—helping his daughters with homework, cooking for his family, and gardening—reflect the same priorities.[20]  And his supervisor confirms that Mr. Frazzetto has always been a conscientiousness worker and a helpful colleague.[21]  As the Court has frequently noted,[22] it is a man's whole life—not just the offense conduct—that matters at sentencing.  Mr. Frazzetto's misconduct should be evaluated in the context of the overall character shown in these letters.  Moreover, the Court should also consider that losing their loving father, husband, brother, and son to a prison sentence in a foreign country 3,000 miles away would be a profound tragedy for his family.

## B.    The Purposes of Sentencing Do Not Require a Custodial Sentence.

The purposes of sentencing set forth in § 3553(a)(2) do not require a prison sentence here.  First, no punishment is needed to deter Mr. Frazzetto from further offenses.  *See* 18 U.S.C. § 3553(a)(2)(C).  This is his first offense in an otherwise unblemished life.  His voluntary surrender from Switzerland, his cooperation, his acceptance of responsibility, and his compliance with his conditions of release—all show his remorse and respect for the law.  Moreover, Mr. Frazzetto had already ceased managing undeclared accounts—other than as part of the Bank's exit program, and by helping clients make voluntary disclosures to the IRS—long before he was indicted.  Indeed, by the time he was indicted, Mr. Frazzetto was no longer a member of Julius Baer's North America Team.  In addition, there is no chance of

---

[19]  *See* Feb. 28, 2018 Letter from Evelina Li Puma-Frazzetto, which is attached as **Exhibit D**.

[20]  *See* Mar. 5, 2018 Letter from Pino Labarille, which is attached as **Exhibit E**.

[21]  *See* Mar. 6, 2018 Letter of Patrick Roefs, which is attached as **Exhibit F**.

[22]  *See Adelson*, 441 F. Supp. 2d at 513; *Gupta*, 904 F. Supp. 2d at 353–54; Transcript of Sentencing Hearing at 51, *United States v. Allen*, No. 14-cr-272 (S.D.N.Y. Mar. 22, 2016), ECF No. 242.

recidivism because, in his current position, he does not manage any client accounts or otherwise deal with the Bank's clients.  Moreover, like most Swiss banks, Julius Baer no longer provides private banking services to undeclared U.S. clients.  Finally, as a result of his guilty plea and conviction, there is no chance Mr. Frazzetto could become a cross-border private banker elsewhere.  In short, Mr. Frazzetto "is unlikely to repeat his transgressions, and no further punishment is needed to achieve [specific deterrence]."  *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).

Second, a non-custodial sentence is sufficient to deter others.  *See* 18 U.S.C. § 3553(a)(2)(B).  Mr. Frazzetto's indictment and guilty plea have already had a significant deterrent effect.  Indeed, in a press release announcing the Julius Baer DPA and the guilty pleas of Mr. Frazzetto and Daniela Casadei, the government announced that these resolutions

> send a strong message to the international banking community as well as U.S. taxpayers who think they can outsmart the system by hiding their money in these international banks.  The consequences of not reporting your foreign accounts and paying the taxes you owe will be significant for those who do not heed the warnings that agreements like this yield. [23]

Mr. Frazzetto's plea was reported by the Wall Street Journal, Bloomberg, Reuters, and Forbes, as well as in the Swiss media, making news of his guilty plea available to the Swiss banking community and the Swiss financial sector. [24]

---

[23]  Dep't of Justice, Office of Public Affairs, Criminal Charges Filed Against Bank Julius Baer of Switzerland with Deferred Prosecution Agreement Requiring Payment of $547 Million, as Well as Guilty Pleas of Two Julius Baer Bankers (Feb. 4, 2016), https://www.justice.gov/opa/pr/criminal-charges-filed-against-bank-julius-baer-switzerland-deferred-prosecution-agreement.

[24]  *See, e.g.*, Neue Zuercher Zeitung, Julius Bär stellt sich hinter angeklagte Banker ("Julius Baer Stands Behind Indicted Bankers") (Feb. 6, 2016), attached with an English translation as **Composite Exhibit G**.  With its suggestion that Mr. Frazzetto and Ms. Casadei were low-

More generally, publicity surrounding prosecutions related to undeclared Swiss bank accounts have triggered remarkable general deterrence.[25]   As noted above, the Swiss Bank Program provided Swiss banks with a mechanism to come forward, admit they unlawfully helped U.S. taxpayers hide their assets, pay a fine, and—in the vast majority of cases— escape criminal prosecution.   Similarly, the IRS established a series of offshore voluntary disclosure initiatives (collectively, "OVDI") allowing most U.S. taxpayers with hidden Swiss accounts to admit they evaded their tax obligations, pay back taxes and a fine, and avoid a referral for prosecution.   More than 56,000 taxpayers had disclosed their undeclared accounts and paid more than $11.1 billion in back taxes, interest, and penalties to the U.S. Treasury.[26] As a result of these initiatives and recent legislation such as the Foreign Account Tax Compliance Act, 26 U.S.C. §§ 1471–74, it is clear that the era of Swiss private banking for U.S. taxpayers is past.   Accordingly, general deterrence does not require a prison sentence.

---

level bankers who did as they were told and who were nevertheless indicted, this article sends a strong message of deterrence even to low-level employees.

[25]   A May 2013 article on the deterrent effect of offshore banking prosecutions observed that (1) the February 2009 UBS Deferred Prosecution Agreement had "shattered Swiss banking secrecy," David B. Massey, Daniel W. Levy, and Jason H. Cowley, *UBS, Wegelin, and Offshore Banking Prosecutions: The Power of General Deterrence*, United States Attorneys' Bulletin, No. 61:3 (May 2013) at 1; and (2) in the wake of the indictment and conviction of Wegelin, which "sent shockwaves through Switzerland's banking sector," *id*. at 5 (quoting Kara Scannell, *Wegelin guilty plea rattles Swiss banks*, Fin. Times Jan 10, 2013), "Swiss banks have largely stopped doing business with U.S. taxpayers, 'so much so that US citizen living in Switzerland find it extremely difficult to open a bank account or get a mortgage,'" *id*. (quoting Imogen Foulkes, *Swiss banks' Unease Over Wegelin*, BBC News, Jan. 4, 2013).

[26]   U.S. Dep't of Treasury, IRS, IRS to End Offshore Voluntary Disclosure Program; Taxpayers with Undisclosed Foreign Assets Urged to Come Forward Now, IR-2018-52 (Mar. 13, 2018), *available at* https://www.irs.gov/newsroom/irs-to-end-offshore-voluntary-disclosure-program-taxpayers-with-undisclosed-foreign-assets-urged-to-come-forward-now.

Third, Mr. Frazzetto does not need medical, vocational, or other rehabilitative treatment. *See* 18 U.S.C. § 3553(a)(2)(D). He fully understands the gravity of his offense, and his current job ensures that he will continue to have a positive impact on society.

Finally, a sentence of time served will properly reflect the seriousness of Mr. Frazzetto's offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). Mr. Frazzetto accepts full responsibility for helping Americans evade their tax obligations. But he has already suffered significantly for his conduct, including the damage to his professional reputation, a long period of unemployment, and a significantly reduced earning potential. Moreover, any period of incarceration would likely result in the loss of his current job and severe economic hardship to his family. Unlike the Swiss Bank Program and the OVDI, there is no leniency program for low-level employees like Mr. Frazzetto who worked at Swiss banks that institutionalized the business of managing undeclared accounts for U.S. tax evaders. Nevertheless, Mr. Frazzetto voluntarily surrendered when he could not have been extradited, pleaded guilty, and fully cooperated with the government to make amends. A sentence of time served would be just punishment.

## C.    A Sentence of Time Served Will Avoid Unwarranted Sentencing Disparities.

"[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. 3553(a)(6), weighs heavily against a term of incarceration for Mr. Frazzetto.

To begin with, others involved in this and other recent Swiss offshore-banking conspiracies will likely never be incarcerated. The OVDI allowed many U.S. taxpayers with undeclared accounts to avoid criminal prosecution. The Swiss Bank Program has allowed Swiss banks to avoid criminal prosecution, and those not eligible for the program have been

fined.  Moreover, while Julius Baer has accepted responsibility, entered into a DPA, and paid

a substantial penalty, ████████████████████████████████████████████

████████████████████████.  Furthermore, thus far, three Swiss bankers implicated

in cross-border tax cases—Michel Guignard, Martin Liechti, and Georg Marti—have

received non-prosecution agreements.[27]  And the only Swiss bankers to have gone to trial—

Raoul Weil and Stefan Buck—have been acquitted by juries.[28]  In short, many persons who

engaged in similar conduct will go unpunished.

   More importantly, every Swiss financial professional who has pleaded guilty and

been truthful with the government has been sentenced to time served or probation.[29]  Table 1,

---

[27]  *See, e.g.*, M. Liechti Non-Prosecution Agreement, *United States v. Weil*, No. 08-cr-60322
(S.D. Fla. July 2, 2008) (ECF No. 47-5); Declaration of Aaron R. Marcu in Support of Raoul
Weil's Motion to Compel the Government to Immediately Disclose All Brady and Giglio
Material and Produce a Bill of Particulars ¶ 12, *United States v. Weil*, (filed May 23, 2014),
ECF No. 47-1 (noting government's production of M. Guignard Non-Prosecution
Agreement); Nathan Hale, Ex-UBS Exec Found Not Guilty in Tax Evasion Trial, Law360
(Nov. 3, 2014), https://www.law360.com/articles/592773/ex-ubs-exec-found-not-guilty-in-
tax-evasion-trial (noting G. Marti's non-prosecution agreement with the government).

[28]  *See*  Judgment of Acquittal, *United States v. Weil*, No. 08-cr-603322 (S.D. Fla. Nov. 3,
2014), ECF No. 188; Judgment of Acquittal, *United States v. Buck*, No. 13-cr-282-JSR
(S.D.N.Y. Nov. 27, 2017), ECF No. 111.

[29]  The only financial professional charged in a Swiss cross-border tax evasion case to have
received a sentence of imprisonment (other than time served) is Bradley Birkenfeld, a U.S.
citizen who was employed by UBS.  Mr. Birkenfeld provided significant information to the
government about UBS's unlawful activities, but—unlike Mr. Frazzetto—Mr. Birkenfeld
failed to disclose his own involvement in those activities.  *See* Government's Motion for
Sentence Reduction Pursuant to § 5K1.1 and § 3553(e), *United States v. Birkenfeld*, No. 08-
cr-60099 (Aug. 18, 2009), ECF No. 76.  Mr. Birkenfeld was indicted and pleaded guilty.  His
advisory guidelines range was 70–87 months, and the Government recommended a
downward departure to 30 months.  Mr. Birkenfeld received a 40-month sentence.  But he
would likely not have been sentenced to any punishment if he had been more forthcoming.
*See* Transcript of Sentencing at 12, *United States v. Birkenfeld*, No. 08-cr-60099 (Aug. 21,
2009), ECF No. 82 (statement of AUSA Kevin Downing) ("[B]ut for Mr. Birkenfeld failing
to disclose his involvement with the [UBS] fraud and the U.S. citizens that he aided and
assisted in tax evasion, I believe we well would have nonprosecuted Mr. Birkenfeld.").

which is attached as **Exhibit H**, summarizes the circumstances, the advisory guideline ranges, and the principal sentences of these defendants.  Christos Bagios received a sentence of time served, comprising the 37 days he spent in custody between his arrest in New York and his release on bond in the Southern District of Florida.   The others were sentenced to probation.  None was sentenced to a significant term of incarceration.  Moreover, as shown in Table 1, these defendants were all bankers (or independent business owners) more senior than Mr. Frazzetto, and they all aided U.S. taxpayers in hiding their Swiss accounts over a much longer period.  This factor weighs in favor of a sentence of time served.

Finally, this Court has recently imposed a sentence of time served on a citizen of the United Kingdom with no criminal history who waived extradition and—like Mr. Frazzetto— appeared voluntarily in the United States.   The defendant, Paul Robson, was a former Rabobank trader who pleaded guilty to conspiracy to commit wire fraud and bank fraud in connection with the LIBOR scandal.  *See* Judgment, *United States v. Robson*, No. 14-cr-272 (S.D.N.Y. Nov. 21, 2016), ECF No. 267.   Mr. Robson's total offense level (22) and advisory guideline range (45–51 months) were much higher than Mr. Frazzetto's.  *See* United States' 5K Letter and Sentencing Memorandum Regarding Paul Robson at 2, *United States v. Robson*, ECF No. 264.  The Court nevertheless sentenced him to time served, comprising the time spent at court on the day of his surrender.  *See* Transcript of Sentencing Hearing at 3–4, *United States v. Robson*, ECF No. 269.  The Court has also imposed similar sentences on other cooperating defendants who—like Mr. Frazzetto—provided valuable assistance to the government and fully accepted responsibility. [30]  The Court should do the same here.

---

[30]   *See* Judgment, *United States v. Longoria*, 1:11-cr-32-JSR (July 16, 2013), ECF No. 195 (imposing sentence of time served, plus two years' supervised release, on cooperating

Mr. Frazzetto respectfully submits that, as in these cases, a sentence of time served is sufficient but not greater than necessary to accomplish the purposes of sentencing in light of the Guidelines and the other § 3553(a) factors.  However, if the Court concludes otherwise, Mr. Frazzetto alternatively submits that, for all of the reasons set forth above, the Section 3553(a) factors likewise support a sentence of probation.

**III.    No Post-Release or Probationary Supervision Is Warranted.**

The defense agrees with the Probation Office that no post-release or probationary supervision is warranted.  Mr. Frazzetto needs no supervision to ease a transition from prison to community life, *see Johnson v. United States*, 529 U.S. 694, 709 (2000) ("Supervised release [under the Sentencing Reform Act of 1984] departed from the parole system it replaced by giving district courts the freedom to provide post-release supervision for those, and *only* those, who needed it") (emphasis added); (2) because he is a Swiss citizen permanently residing in Switzerland; and (3) for all of the other reasons set forth above, *see* 18 U.S.C. §§ 3562(a) & 3583(c).  Since 2015, Mr. Frazzetto has voluntarily traveled from his home in Switzerland to the United States to cooperate whenever prosecutors wished; he needs no incentive to motivate continued cooperation.

---

defendant whose offense level of 23 included an adjustment for willfully obstructing the government's investigation); Judgment, *United States v. Motey*, 1:10-cr-1249-JSR (Feb. 11, 2013), ECF No. 19 (sentence of time served, plus one year supervised release, on defendant with advisory guideline range of 18–24 months); Judgment, *United States v. Shimoon*, 1:11-cr-32 (July 19, 2013), ECF No. 197 (sentence of time served, plus two years supervised release, on defendant with advisory guideline range of 37–46 months); Judgment, *United States v. Pflaum*, 1:10-cr-1265-JSR (Feb. 13, 2013), ECF No. 12 (sentence of time served, plus two years of supervised release, on cooperating defendant with advisory guideline range of 46–57 months); Judgment, *United States v. Devore*, 1:10-cr-1248-JSR (Dec. 6, 2013), ECF No. 15 (imposing sentence of time served, plus two years of supervised release, on cooperating defendant with advisory guideline range of 15–21 months).

**IV.     No Restitution Order Is Warranted.**

No need exists for an order of restitution because—as noted in the PSR—the IRS has already been fully compensated for any actual losses,[31] from two sources:  (1) tax payments made by many of Mr. Frazzetto's former U.S. clients, including those who participated in the OVDI; and (2) the $247 million "Tax Restitution Amount" paid by the Bank as part of the Julius Baer DPA, which "represents the approximate pecuniary loss to the United States resulting from the conduct described in the DPA's Statement of Facts,"[32] including Mr. Frazzetto's conduct.  Moreover, the defense understands that the government agrees that Mr. Frazzetto does not owe restitution, in light of the restitution payments made by the Bank. Finally, so far as counsel is aware, no similarly situated Swiss banker has been ordered to pay restitution.

Mr. Frazzetto does not oppose a fine of $6,000, as the PSR recommends.[33]  A greater fine would unduly burden a young family with few assets, only one full-time wage earner,

---

[31]   Restitution is intended to compensate victims for their actual losses.  *See United States v. Pescatore*, 637 F.3d 128, 138-39 (2d Cir. 2011); *United States v. Certified Envtl. Servs.*, 753 F.3d 72, 102-03 (2d Cir. 2014) (Rakoff, J.)  Accordingly, restitution to the government for a tax offense must be reduced by the amounts paid to the tax authorities by the defendant or third parties.  *See United States v. Cadet*, 664 F.3d 27, 34 (2d Cir. 2011); *cf. United States v. Varrone*, 554 F.3d 327, 333-34 (2d Cir. 2009).

[32]   Julius Baer DPA ¶ 5.

[33]   Mr. Frazzetto respectfully disagrees with the Probation Office's conclusion that the advisory guideline range for Mr. Frazzetto's offense is $6,000–$1,100,000.   The actual advisory guideline range is $6,000–$60,000.  *See* U.S.S.G. §§ 5E1.2(c)(3) and (h)(1) (2016) (directing, "for offenses committed prior to November 1, 2015, use the applicable fine guideline range that was set forth in the version of § 5E1.2(c) that was in effect on November 1, 2014, rather than the applicable fine guideline range set forth in subsection (c) [of the current version]." ); U.S.S.G. § 5E1.2(c) (Fine Table for Individual Defendants) (2014) (providing for an advisory guideline fine range of $6,000–$60,000 for an offense level of 18–19).   The Probation Office apparently reasoned that, under U.S.S.G. § 5E1.2(c)(4) (the "Section 5E1.1(c)(4) Exception"), the maximum fine set forth in §

and an income that, while likely larger than that of many defendants who appear before this Court for sentencing, is modest in their community.

## CONCLUSION

For the reasons set forth above, Mr. Frazzetto respectfully requests that the Court impose a sentence of time served.

Dated: March 14, 2018

Respectfully submitted,

/s/ David B. Weinstein
David B. Weinstein
N.Y. Bar No. 4844767
weinsteind@gtlaw.com
Andrew J. Patch
N.Y. Bar No. 4389383
patcha@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd. Ste. 1900
Tampa, Florida  33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

Jared E. Dwyer (*admitted pro hac vice*)
Conn. Bar No. 420681
dwyerje@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 SE 2d Ave Suite 4400
Miami, Florida  33131

Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Counsel for Defendant*
*Fabio Frazzetto*

---

5E1.2(c)(3) does not apply because the statutory maximum exceeds or could exceed $500,000 under 18 U.S.C. § 3571(d).  But fines imposed under § 3571(d) do not trigger the Section 5E1.1(c)(4) Exception.  *See* U.S.S.G. § 5E1.2, Application Note 4; *cf. United States v. Chusid*, 372 F.3d 113, 117-18 (2004) (agreeing with the government that "Section 5E1.2(c)(4) does not apply to fines imposed under Section 3571(d)."). *See also S. Union Co. v. United States*, 567 U.S. 343, 360 (2012) (holding that any fact increasing a statutory maximum fine must be charged and proved to a jury beyond a reasonable doubt).

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 14, 2018, the foregoing Defendant Fabio Frazzetto's

Sentencing Memorandum was filed with the Clerk using the CM/ECF system.

<u>/s/ David B. Weinstein</u>
Attorney